[Cite as *State v. Kinney*, 2019-Ohio-2704.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DAVID CARL KINNEY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 BE 0011**

---

Criminal  Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 17 CR 154

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Daniel P. Fry*, Belmont County Prosecutor, *Atty. Kevin Flanagan*, Chief Asst. Prosecuting Attorney, 147-A W. Main Street, St. Clairsville, Ohio 43950 for Plaintiff-Appellee and

*Atty. Christopher J. Gagin*, McCamic, Sacco & McCoid, PLLC, 56 14th Street, Wheeling, West Virginia 26003 for Defendant-Appellant.

Dated:  June 28, 2019

_____

**Robb, J.**

{¶1}   Defendant-Appellant David Kinney appeals his aggravated murder conviction entered after a jury trial in the Belmont County Common Pleas Court.  He raises issues with:  the sufficiency and the weight of the evidence on the element of prior calculation and design; the lack of *Miranda* warnings during the police interview until after he admitted and demonstrated the shooting; the voluntariness of his statement to police; the admissibility of a recorded spousal conversation; the denial of access to the grand jury transcript; the failure to excuse two venire members for cause; whether a jury instruction suggested the jury had to unanimously acquit him of aggravated murder before considering the lesser charge of murder; the refusal to instruct on voluntary manslaughter; and the reviewability of the sentence of life without parole.  For the following reasons, the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2}   Appellant became friends with Brad McGarry (the victim) after they met at a coal mining class in 2011.  Appellant was married, and his wife had three children he considered his own.  They spent holidays with the victim, and the children called him "uncle."  At some point, Appellant and the victim began having an affair.  Starting at the end of 2016, Appellant's wife voiced suspicions about the affair to Appellant.  (Tr. 569-573).  Around this time, the victim was upset Appellant would not leave his wife for the victim.  (Tr. 889, 892).

{¶3}   On May 6, 2017, the victim went to a wedding in Monroe County and stayed at his mother's house.  During a family meal on May 7, the victim received a message on his phone and rushed to leave in a mood that was described as happy, giddy, and excited.  (Tr. 298).  Before leaving, he indicated to his cousin that he would return a tuxedo to the mall and then go home to meet Appellant where he expected they would take "a nap."  The victim said this with a wink, suggesting to the cousin the victim was meeting Appellant for a sexual encounter.  (Tr. 315-318).  The victim returned the tuxedo and arrived at his home in Bellaire, Ohio around 2:55 p.m.  The police chief lived on the same street as the victim, and his surveillance system captured footage of vehicles traversing the street.  A

<u>Case No. 18 BE 0011</u>

car driven by Appellant traveled toward the victim's house at 1:59 p.m. and traveled away from the victim's house at 3:11 p.m. (sixteen minutes after the victim arrived home). (Tr. 476).

{¶4} Later that day, Appellant drove his wife and her thirteen-year-old daughter from their home in Brilliant, Ohio to the victim's house (over 30 minutes away) where they were to visit and to deliver a weed trimmer. The child went to the door first and noticed it was open. When they looked in the kitchen, they noticed drawers and cupboards open and items strewn about. After unsuccessfully calling the victim vocally and over the phone, Appellant's wife told him to retrieve his firearm. It was in his car, and he had a concealed carry permit. Upon retrieving his .40 caliber handgun, Appellant explored the main floor of the house. Upon descending to the basement, which was also a garage, he yelled for his wife to call 911. She went downstairs followed by her daughter. At 6:15 p.m., Appellant's wife called 911 to report the discovery of the victim's body surrounded by a pool of blood.

{¶5} The victim was lying face down on the floor near a covered hot tub in a cluttered area of the basement. The victim had been shot twice in the back of the head. Gunshot residue was observed around both entrance wounds. (Tr. 604). One shot entered the top-back portion of the victim's scalp and exited the top-front of the scalp without entering the skull or brain. (Tr. 599). Although the bullet caused a skull fracture and blood loss, this wound likely would not have been fatal with medical care. (Tr. 602). A deformed bullet fragment was found on the basement floor; brushed copper was still visible on the small caliber bullet, which appeared consistent with a .22 caliber bullet. (Tr. 721).

{¶6} After learning about a hat at the scene, the forensic pathologist opined the gun would have been fired from a few to several inches away to cause this perforating scalp wound; he originally believed it was a contact wound due to the amount of gunshot residue. (Tr. 638, 658, 678). The hat was found on the hot tub. Indications that it was on the victim's head during the shot through the scalp included a dense pattern of gunshot residue around a hole in the top of the hat and a piece of skin tissue with hair stuck to the outside front of the hat under another hole. (Tr. 719, 724, 808). During a later search,

police recovered an additional piece of the victim's skin tissue with hair from the side of the washing machine located 10-15 feet from the body. (Tr. 518, 764, 785).

{¶7} As for the fatal shot, the bullet entered the back of the victim's head in the left occipital area and was recovered from the right, front portion of the brain. (Tr. 608-609). This bullet was specifically identified as a .22 caliber long rifle copper-washed lead bullet; in this context, "long rifle" refers to the caliber, not the type of gun used to fire it. (Tr. 762, 811). The forensic pathologist opined the fatal wound was a partial contact shot inflicted at an angle, noting the abundance of soot on the right side of the entry wound. (Tr. 633-635).

{¶8} The police believed the scene appeared staged to look like a robbery because it seemed "neatly ransacked" and valuable items were visible, including a gun in an open nightstand drawer and money. Various drawer handles were swabbed and tested for touch DNA. Most swabs did not contain enough material for analysis, but the victim's DNA was predictably found on a kitchen drawer. (Tr. 521-526, 554).

{¶9} Upon speaking to the responding officers at the scene, Appellant reported the victim was his best friend who was like a brother to him. It was said the victim planned to go on vacation with Appellant's family that summer. When asked if anyone may have reason to commit the offense, Appellant named a man the victim dated (who was cleared due to his incarceration at the time). He also mentioned two men who recently installed a fence at the house. (Tr. 351, 905). Appellant provided a written statement at the scene. A detective explained they would conduct a detailed follow-up interview of him and his wife in the next few days. During interviews with others, it was reported the victim was having an affair with Appellant and threatened to tell Appellant's wife about the relationship. (Tr. 975-976).

{¶10} Appellant arrived at the police station for his interview two days after the shooting. He provided DNA for purposes of elimination. He also provided consent to search his phone and the passcode. He said he and his step-son went to visit the victim the day before the shooting. The victim called him that night during and after the wedding, and they spoke both times. Appellant discussed his activities on the day of the shooting, omitting any mention of being at the victim's house earlier that day. He told a similar story of finding the body that he told at the scene.

{¶11} When the detective asked about certain items discovered on Appellant's phone, Appellant admitted he had recurrent sexual encounters with the victim for years. He said his wife did not know about the sexual relationship. Appellant thereafter disclosed that he was in Bellaire earlier on the day of the shooting and drove by the victim's house. He then said he waited in front of the victim's residence rather than merely driving by.

{¶12} Eventually, Appellant claimed he waited until the victim drove up with another man; although, the detective remembered the front passenger seat of the victim's vehicle was filled with items. Appellant said he heard a gunshot from the basement, he did not see the shooting, and he fled the scene because he was scared. He apologized for not calling the police. Thereafter, he said he witnessed the shooting, which prompted the shooter to threaten Appellant's life and say his wife would learn of the affair if Appellant implicated him in the shooting.

{¶13} Finally, Appellant admitted he was the person who shot the victim. The detective asked if Appellant staged the scene to look like a robbery. In response, Appellant said the victim was upset about missing money and was opening drawers while Appellant was insisting he did not take it. Regarding another topic of argument, Appellant recited: the victim had been asking him to leave his wife for some time; he loved the victim but also loved his wife and kids; he told the victim he had no thoughts of leaving his family for the victim; and he informed the victim they had to discontinue the affair. According to Appellant, the victim flipped out, smacked him with both hands, told him to leave his wife, yelled about how Appellant "fucked with" his emotions for so long, and then started waving and pointing a Derringer at him.

{¶14} Appellant said he grabbed the gun and pushed the victim back. He said the victim then rushed at him. He said he felt threatened and shot the victim, first in the top of the head and then in the back of the head after the victim was down. The detective observed how Appellant motioned as if he first shot the victim across the top of the head from the front, but the wound showed this shot was fired from the back. Appellant then demonstrated a maneuver that put the victim bending at the waist as Appellant pushed him down and fired down at his head at the same time. He then demonstrated the second shot occurred as he stood over the victim who was on his knees with his head on the ground.

**{¶15}** The detective informed Appellant his status had changed, and *Mirandized* Appellant. Appellant told his story to another officer and provided a written statement. The entire interview was recorded, and the recording continued after Appellant's wife entered the interview room and conversed with Appellant.

**{¶16}** Appellant was indicted for aggravated murder with a firearm specification. At the 2018 jury trial, the complete recording of Appellant's statement at the police station was played to the jury. The detective testified Appellant was not crying as much as he made it appear. (Tr. 1002). The detective voiced the evolving statements led him to believe Appellant planned an ambush after luring the victim home with a promise of a sexual encounter and then staged the scene. (Tr. 982, 986). He noted after Appellant said he threw the gun from the car while driving home from the shooting, a search of the specific stretch of road described by Appellant did not yield the gun. (Tr. 947-948).

**{¶17}** Regarding Appellant's claim that the victim owned the Derringer and usually kept it on the hot tub, a friend testified the victim was frightened of guns but decided to purchase one with Appellant for self-defense around Thanksgiving of 2016. (Tr. 885-886). Another witness (the fiancé of the victim's mother) knew the victim owned one firearm and kept it in his room. (Tr. 392, 308). A police officer who knew the victim testified the victim recently asked for his advice on obtaining a concealed carry permit and on buying his first gun. The victim thereafter said he purchased a Hi-Point 9mm, which he fired at a range. (Tr. 557-562). The gun found in the victim's nightstand was a 9mm Hi-Point semiautomatic pistol, and two magazines of 9mm ammunition were in the drawer with the gun. (Tr. 349-350, 389-390, 481, 713-714). The detective noted they did not find a holster for a Derringer (which he said would be dangerous to carry in a pocket) or .22 caliber ammunition at the victim's house. (Tr. 912-913). Bullets for a .22 and a 9mm cannot be used interchangeably. (Tr. 482). They did find a box of .22 caliber long rifle ammunition in Appellant's truck. (Tr. 865, 951); (St Ex. 137, 141).

**{¶18}** A detective who examined Appellant's phone testified to communications between Appellant and the victim: the victim accused Appellant of lying in 2016; intimate photographs were exchanged; and the victim seemed upset Appellant did not spend more time with him in 2017, but no texts seemed angry or threatening. (Tr. 849-850). On the day of the shooting: they texted each other to say "morning" and ask about the prior night;

the victim texted "hi" at 1:31 p.m.; and Appellant called the victim three times with the longest call lasting less than two minutes. At 1:45 p.m., the victim texted, "Don't forget my surprise, LOL." (Tr. 835-837). After leaving the victim's house, Appellant texted the victim at 3:13, "We will be bringing it out," and then at 3:26, "Stopped by. You weren't home yet. Call me when you get there and will come out." (Tr. 838-840). Appellant then called the victim's phone various times.

{¶19} Appellant's wife testified Appellant brought her and her children to a restaurant and a store on the Sunday they found the victim. He then left them at home for a time and used her car. (Tr. 574). When he returned, she did not notice anything strange or suspicious about him other than the fact that he helped her dye her hair. (Tr. 575). She said they then took Appellant's truck to the victim's house, which she claimed they planned the prior day. (Tr. 574).

{¶20} The defense called another friend of the victim to testify. He believed that many years before he heard the victim mention buying a Derringer; he remembered making a joke about the small size of a Derringer but noted he never saw the gun. (Tr. 1044-1047). He said if the victim got upset, he would yell and waive his phone around but would then "go cry in the corner." (Tr. 1039-1040). The victim was not the type to start a physical fight. (Tr. 1048). The victim paid Appellant for work around the house, but Appellant did not complete it. (Tr. 1042). The victim was upset Appellant had to "back off" when his wife became suspicious and was upset when Appellant wanted to break up but stay friends. (Tr. 1041-1043). At the end of 2016, the victim was thinking of exposing the affair to Appellant's wife; he talked about sending her messages and photographs exchanged between himself and Appellant. (Tr. 1042). When he learned Appellant spoke about possibly killing himself due to the situation, the witness told the victim not to push so hard and just accept the relationship as it existed. The victim joked his friend should read the news and check on him more often. (Tr. 1052).

{¶21} The defense presented the testimony of a forensic pathologist who confirmed the testimony of the state's forensic pathologist that: there was no scientific way to determine which wound occurred first; the bruises on the victim's forehead and cheek were likely from the fall after the shooting; and the bruising on the eye was likely from internal blood pooling. (Tr. 1072, 1081). He said the gunshot residue pattern for the

fatal wound would have been very unlikely if the gun was a foot or more away from the head (as indicated by Appellant's demonstration for the detective). (Tr. 1079, 1086-1087). He believed the fatal shot was fired at a distance of no more than three inches. (Tr. 1078). As for the first shot, this witness testified that if the victim's head was facing down and if Appellant was standing in the position he indicated, then the scalp fragment would not likely have ended up on the washing machine. (Tr. 1097-1098). He also opined it was probable the event was dynamic with the bodies in motion. (Tr. 1097).

{¶22} In response to the expert report provided by the defense, a BCI agent testified that predicting tissue trajectory from a gunshot would not be scientifically reliable in this case. (Tr. 786). He opined a shooting reconstruction was not possible as bodies move, guns can create violent explosions of tissue, and tissue is unpredictable. (Tr. 775-776). He also noted the prediction from the defense expert was that scalp tissue would not fly to the washing machine "if" the victim's head was facing down at impact. (Tr. 785).

{¶23} Appellant also presented the testimony of a forensic psychiatrist who opined that Appellant experienced Acute Stress Disorder after the shooting, which could explain some of his poor choices after the event. (Tr. 1136-1144). In rebuttal, the state presented expert testimony from another forensic psychiatrist who disagreed with the diagnosis. (Tr. 1180-1181).

{¶24} The jury found Appellant guilty of aggravated murder with a firearm specification. A presentence investigation was ordered. The court imposed a sentence of life without parole for aggravated murder plus three years for the firearm specification. Appellant filed a timely notice of appeal from the February 15, 2018 sentencing entry and filed a 55-page brief with leave of court.

ASSIGNMENT OF ERROR ONE: SUFFICIENCY

{¶25} Appellant sets forth ten assignments of error, the first of which contends:

"DEFENDANT-APPELLANT'S AGGRAVATED MURDER CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE OF PRIOR CALCULATION AND DESIGN."

{¶26} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if believed. *State v.*

*Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).

**{¶27}** A conviction cannot be reversed on the grounds of insufficient evidence unless the reviewing court determines, after viewing the evidence in favor of the prosecution, that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). Rational inferences to be drawn from the evidence are also evaluated in the light most favorable to the state. *See State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). Even erroneously admitted evidence can be considered to determine whether the evidence was sufficient to sustain the guilty verdict. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80; *Lockhart v. Nelson*, 488 U.S. 33, 35, 38, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). This relates to the principle that a defendant cannot be retried if the evidence was insufficient, but the remedy for the erroneous and prejudicial admission of evidence is a new trial with exclusion of the evidence. *See id.*

**{¶28}** The elements of the pertinent type of aggravated murder are to cause the death of another purposely and with prior calculation and design. R.C. 2903.01(A). Appellant challenges the sufficiency of the evidence on the element of prior calculation and design, applying the Ohio Supreme Court's *Walker* case. In *Walker*, the Supreme Court adopted statements made by the Ohio Legislative Service Commission when the statute changed from "deliberate and premeditated malice" to "prior calculation and design." For instance, the element prior calculation and design requires "an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17. The "advance reasoning to formulate the purpose to kill" cannot be mere "momentary deliberation." *Id.* at ¶ 17-18. Still, the pre-offense degree of care and length of time spent pondering the act need not be great and are among many factors to consider. *Id.* at ¶ 17

{¶29} Traditional factors to consider include: (1) the relationship between the defendant and the victim and any strain; (2) the thought or preparation involved in choosing the murder weapon or site; and (3) the length of time surrounding the act, i.e., prolonged, a nearly instantaneous eruption of events, or somewhere in between. *See id.* at ¶ 20. Prior threats are pertinent, including a threat to obtain a weapon. *Id.* at ¶ 21. "Pursuing and killing a fleeing or incapacitated victim after an initial confrontation strongly indicates prior calculation and design." *Id.* The style of a shooting, such as an "execution-style" killing, can be an additional indicator. *Id.* at ¶ 21-22. A review of the factors helps a court determine whether the jury could reasonably infer from the evidence that the defendant planned the murder with prior calculation and design. *See id.* at ¶ 26.

{¶30} In *Walker*, the Court concluded that although the jury could reasonably infer the defendant had a purpose to kill the victim, the jury could not reasonably infer prior calculation and design when considering the totality of the circumstances, including: the defendant did not know the victim; the defendant did not choose the site as they happened upon each other at a bar; a bar fight broke out while the defendant was already armed; he originally used a fist and a bottle during the fight; the scene quickly escalated into a chaotic free-for-all; the defendant backed away and hid behind a pillar twenty seconds before the shot; a single shot was fired; and the events were recorded by surveillance video. In distinguishing between the presence or absence of prior calculation and design, there is no bright-line test, and each case depends on its own particular facts. *Id.* at ¶ 19.

{¶31} Appellant contends a reasonable juror could not find prior calculation and design by claiming: the relationship between him and the victim was not more strained than usual; there was no history of Appellant being violent or making threats; the victim owned the weapon used in the shooting and introduced it into an argument; the scene of the shooting was the victim's own house; the meeting was prearranged rather than an ambush; the theory the victim was "lured" by the Appellant's promise of sex was unsupported; the DNA on a used condom in the bedroom trash did not belong to Appellant; the scalp wound would not be considered execution-style and suggested a struggle; the situation was an unexpected and instantaneous eruption of events; Appellant's demonstration of the events was not a perfect recreation of the shooting, which the physical evidence shows was more dynamic than he suggested; the victim was

only home for 16 minutes before Appellant left the scene; and Appellant's DNA was not found on the drawer handles which counters the theory that he staged the scene to look like a robbery.

{¶32} As for the relationship and motive, it is relevant that Appellant was married with three children he considered his own, and he had been having a sexual relationship with his best friend for years. The victim wanted Appellant to leave his wife. Appellant believed his wife did not know of the relationship. Although she voiced a suspicion to Appellant months before, he apparently assured her they were nothing but friends. He feared she would discover the truth. One of Appellant's initial stories suggested his fear was strong: he said he fled the scene of the shooting without calling the police after an unidentified man shot the victim and made threats to Appellant including a threat to expose Appellant's homosexual affair. Although he later admitted this story was untrue, it reveals what he characterized as a strong threat and motivator to him. Around the time of the shooting, the victim was also accusing Appellant of taking money from his house.

{¶33} The 16 minutes during which the victim was home before Appellant left the scene does not necessarily work in Appellant's favor as he claims. He was at the victim's house for almost an hour before the victim arrived, even though he knew the victim would not be home that early. In general, Appellant had sufficient time and opportunity for planning. Additionally, after the victim heard from Appellant, he seemed excited to leave a family dinner early to meet Appellant. He disclosed they were going to take a "nap" (in a manner causing the victim's cousin to believe the encounter would be sexual). Around this time, the victim texted Appellant suggesting he was excited about a "surprise" Appellant had apparently mentioned to him. Yet, Appellant claimed he went there to tell the victim they could not continue their affair.

{¶34} Regarding the weapon, the jury need not believe it belonged to the victim. There was testimony the victim recently bought his first gun, a 9mm Hi-Point, which was recovered from his nightstand, with two magazines of 9mm ammunition. In the victim's house, .22 caliber ammunition could not be located, but .22 caliber ammunition was located in Appellant's truck. Appellant said he had a .40 caliber firearm, and a shotgun (with shells) was found in the truck as well. Appellant claimed the victim kept a loaded .22 caliber firearm on the hot tub, but there was testimony indicating: the mother's fiancé

knew the victim kept his firearm in his room; a friend never saw a gun left out in the victim's house; Appellant reported he was at the victim's house the day before the shooting with a child (his stepson); and his wife testified they had plans to bring another child (his step-daughter) to the victim's house on the day of the shooting.

**{¶35}** Moreover, as the state points out, the fatal wound could be considered execution-style. In fact, there was gunshot residue around both wounds. Appellant said he shot the victim in the top-back of the head first. This wound would not have been fatal had Appellant called for help. Appellant admitted he then shot the victim in the back of the head as the victim was on the floor. A second, more centered shot to the back of the head once the victim was already shot in the head and down on the ground suggests preplanning. Contrary to Appellant's contention, the nature of the first shot (which entered from the back of the top of the scalp) does not require one to conclude there was a fight or a lack of pre-planning merely because it was not accurately aimed to penetrate the brain. The shooting occurred in a cluttered basement-garage in a cramped space. The area behind the victim was more suitable for hiding than conversing. And, Appellant was ten inches taller than the victim.

**{¶36}** Furthermore, the victim was not considered the type of person to start a physical fight and was not comfortable with a gun. The shooting occurred in the basement rather than on the main floor of the house where the drawers were askew. A staged robbery, although occurring after the shooting, can be a factor to consider under the totality of the circumstances. As the state points out, the inability to retrieve Appellant's touch DNA from the drawer handles was not some major fact in Appellant's favor; the forensic scientists could not find a significant source on most swabs to match even the victim's DNA.

**{¶37}** Certain actions, not just before or during but also after a shooting, can support a determination of a pre-existing scheme or plan. Although the evidence indicated Appellant arrived at the victim's house an hour before the victim, he did not respond to the victim's earlier text, "Don't forget my surprise, LOL," until minutes after leaving the body at the house at which time he responded, "We will be bringing it out." Appellant spoke of a prior plan to bring the victim a weed trimmer. Yet, he traveled more than 30 minutes from his house to the victim's house before the shooting without bringing

this item. Three hours after the shooting, he then went back to the house with the item, bringing his wife and her child with him to discover the body and call the police. He also drove his wife's car to the shooting, but drove his truck back to the scene later. During the interim, he did not seem shocked or nervous to his wife (who was in his close presence as he helped dye her hair).

{¶38} As can be seen, some of Appellant's contentions under his sufficiency assignment of error involve credibility or weight of the evidence, which is the subject of his next assignment of error. Appellant changed his story multiple times. There is no requirement that one accept as entirely true his last story about them arguing and him disarming the victim. Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001) (and because a defendant's intent dwells in his mind, the surrounding facts, circumstances, and resulting inferences are all used to demonstrate intent). In fact, "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991). Viewing all of the evidence and rational inferences in the light most favorable to the prosecution, a rational juror could find that Appellant purposely caused the victim's death with prior calculation and design. In accordance, this assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: WEIGHT

{¶39} Appellant's second assignment of error alleges:

"DEFENDANT-APPELLANT AGGRAVATED MURDER CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶40} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Weight depends on the effect of the evidence in inducing belief but is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *See id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review).

{¶41} When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether,

in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Nevertheless, this discretionary power of the appellate court to grant a new trial on these grounds is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶42}** Additionally, where a case was tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389.

**{¶43}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We therefore generally proceed under the premise that when more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶44}** Appellant refers this court to the arguments he presented under his sufficiency assignment of error on the element of prior calculation and design. We already discussed various arguments in the first assignment of error where Appellant placed them. Whether the victim owned a .22 caliber firearm, kept it on a hot tub, or pointed it at Appellant during an argument in the basement were jury questions. The victim's excitement to meet Appellant was at odds with Appellant's expressed reason for meeting the victim, suggesting Appellant gave the victim the impression of a rendezvous. As the state points out, it does not seem credible that Appellant would plan to bring his wife and

her child to the victim's house later that day if he was planning to end the affair earlier in the day. Appellant arrived well before the victim, and the shooting occurred soon after the victim arrived. The question of a staged robbery was a jury question. As previously observed, the lack of Appellant's DNA on drawer handles does not mean he did not open them; the victim's DNA could not be discovered on most of them either and he lived there. And, if an argument was occurring on the first floor while the victim was opening his cupboards and drawers, it is questionable why both Appellant and the victim would then end up in the small area in the basement by the hot tub.

**{¶45}** Appellant urges a person would not plan to shoot his best friend at that friend's house in the middle of a Sunday afternoon in May when people are likely to be outside. He notes he admitted to the shooting but did not confess to a planned event. Again, the jury was not required to believe the final story Appellant related to the police. Even that story placed him standing above an incapacitated victim who had been shot in the back/top of the head and firing a second, more centered, and fatal shot into the back of the victim's head. We note Appellant wished the jury to disbelieve certain aspects of his story. That is, he demonstrated that he stood above the victim who was on the floor for the second shot; but, the victim's second wound displayed a gunshot residue pattern suggesting a closer or angled contact wound. He sought to have this interpreted as meaning the second shot actually occurred during the struggle (rather than as he demonstrated it). However, one could reasonably find the fatal shot occurred as Appellant stood over the incapacitated victim but then bent down to ensure the second shot did the job the first shot failed to do. Jurors are free to believe some, all, or none of the testimony of each witness, and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. Jefferson No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971).

**{¶46}** Appellant also suggests the scalp tissue would not have traveled through the air to the washing machine if he was pressing the victim down by the head but states it could have landed there if the motion was a dynamic pushing of the victim. The tissue also could have traveled by the violent explosion of a gunshot wound if the victim was walking through his basement when he was shot through the top of his hat and head, causing his hat to land on the hot tub with part of the dislodged scalp tissue remaining

Case No. 18 BE 0011

just outside the exit hole in the hat. Plus, Appellant's forensic pathologist found physics would not support the tissue location *if* the victim's head was faced to the floor. He did not opine on the physics of the matter if the victim was walking or standing and was shot from behind at a close or intermediate range. In any event, a BCI agent warned that scene recreation from tissue trajectories may not be scientifically reliable in this case.

**{¶47}** As previously noted, circumstantial evidence inherently possesses the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485. Upon reading the entire transcript and viewing all of the evidence presented, including that set forth in the Statement of the Case above, we conclude the verdict is not contrary to the manifest weight of the evidence. The jury did not lose its way in finding Appellant guilty of aggravated murder. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE: <u>*MIRANDA*</u>

**{¶48}** Appellant's third assignment of error provides:

"THE TRIAL COURT ERRE[D] IN FAILING TO SUPPRESS THE INTERROGATION VIDEO AS DEFENDANT-APPELLANT WAS IN CUSTODY FOR PURPOSES OF *MIRANDA*."

**{¶49}** Appellant filed a motion to suppress his statements due to the failure to provide *Miranda* warnings until just before the detective asked him to repeat his statement to another officer. He argued his encounter at the police station was objectively transformed from a voluntary interview into a custodial interrogation, citing to certain statements by the detective beginning with "I know you had something to do with it" (which occurred approximately 1 hour and 20 minutes after Appellant first entered the interview room). The trial court watched the video interview, listened to oral arguments, and overruled the motion to suppress. (6/28/17 J.E.; 7/6/17 J.E.).

**{¶50}** Regarding his re-statement of the final story to the other officer after *Miranda* warnings were provided and regarding his final written statement, the defense urged that statements repeated after *Miranda* warnings would not be admissible if the original telling of the story was not admissible. *See Missouri v. Seibert*, 542 U.S. 600, 617, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (where a plurality held: "Because the question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not

reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible") (with a fifth justice holding this test should only apply where the two-step interrogation technique was a deliberate *Miranda* violation). The issue as to the post-*Miranda* statements would arise only if the interrogation became custodial at certain earlier points, and the state's response focuses on Appellant's initial query as to whether *Miranda* warnings were needed earlier since Appellant was relying on self-defense.

{¶51} The warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are required only if a suspect is subjected to custodial interrogation. The ultimate question is whether there was a formal arrest or a restraint on the freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The determination of whether a custodial interrogation has occurred requires an objective inquiry into whether a reasonable person would have felt he was not at liberty to terminate the interview and leave. *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). A "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). It has thus been said an officer's unarticulated plan has no bearing on the question of whether a suspect was in custody at a particular time. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

{¶52} *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Beheler*, 463 U.S. at 1125, quoting *Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The circumstances of each case influence the determination of whether a person was "in custody" for purposes of *Miranda* protection, and one circumstance may be that the defendant is the one who originally initiated communication with police. *See Beheler*, 463 U.S. at 1125.

{¶53} It is conceded Appellant appeared at the police station voluntarily with his wife in order to supplement his statement given at the scene two days earlier and assist police in finding his best friend's killer. He entered the interview room at 7:39 p.m. without

being searched or handcuffed. He was interviewed by one detective who was wearing jeans and a short-sleeve shirt. The detective's style was informal and understanding. Appellant voluntarily provided DNA for exclusion purposes since he found the body. He also voluntarily provided consent to search his phone. He provided background and related his initial story. After Appellant started crying, the detective left the unlocked interview room to get him paper towels and water.

**{¶54}** The detective returned with questions about information found on Appellant's phone showing Appellant and the victim appeared to be more than friends. Appellant then discussed their affair. The detective left the room again and returned to tell Appellant that witnesses were reporting his wife knew about the affair. When the detective asked if Appellant was in Bellaire earlier in the day, Appellant sobbed and claimed he already said he texted the victim to say he drove by but no one was home; he said to check his phone, estimating this was around 2:00 p.m. The detective said, "Relax. We're just talking." Appellant cried and covered his face. When the detective voiced the situation was starting to look "pretty messed up," Appellant said, "I know it is" and "I'm freaking out." Appellant denied the victim wanted him to leave his wife, stating the victim understood.

**{¶55}** On appeal, Appellant concedes he was not in custody when the interview began or for the first hour and twenty-some minutes he was in the interview room. Around that time, however, he claims the interview turned custodial for purposes of *Miranda*. First, it is alleged *Miranda* warnings should have been administered after Appellant asked, "you guys really think" and then trailed off crying, to which the detective responded: "Not think. I know you have something to do with this."

**{¶56}** The detective then mentioned Appellant's GPS coordinates would be used to show how long he was at the victim's house. It does not appear the police had this information or the police chief's video yet. However, an officer's false statement about having discovered certain incriminating evidence (such as the defendant's fingerprints) at the scene has no relevance to whether a person who voluntarily appears for an interview was in custody. *Mathiason*, 429 U.S. at 495-496. Moreover, it has been observed that a defendant's "contention that he had to be given *Miranda* warnings once the investigative process moved to the point where [the agent] was trying to obtain a confession is simply

incorrect." *United States v. Chee*, 514 F.3d 1106, 1113-1114 (10th Cir.2008) (a consideration is whether the environment became more restrictive). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

**{¶57}** Additionally, the detective appeared to be focusing on Appellant's wife at this point, asking if Appellant was present during the shooting and whether his wife killed the victim. Appellant mentioned he came to the interview with the understanding the police may discover his relationship with the victim. The detective noted the problems associated with hiding facts and attempting to remember lies. Nearly 1.5 hours after Appellant entered the interview room, the detective said there was no reason Appellant could not go home with his family at the end of the day. (Video 2, Counter 1268**).

**{¶58}** Although Appellant's brief argues this actually meant that he was not free to go until he provided more information, the detective's comment does not equate with a formal arrest or a restraint on the freedom of movement of the degree associated with a formal arrest. In addition, the comment (on going home with his family) was made in the context of a conversation about Appellant's love for the victim causing him to risk the loss of his wife and step-children if they discovered the affair. The detective followed these statements with praise for Appellant's character. He voiced a theory that the shooting was an accident which caused a panicked post-shooting situation. Eventually, Appellant told a story about an unidentified man shooting the victim, saying he heard the shot but did not see the shooting. The detective asked if Appellant did it and then asked if Appellant's wife killed the victim. The detective criticized Appellant for bringing a child to the scene knowing a dead body would be found.

**{¶59}** Approximately 1.75 hours after Appellant entered the interview room, the detective said people who hear the evidence may think Appellant was a "cold, calculated assassin." He said he was not accusing Appellant of purposely shooting the victim but some "assholes" could paint a negative picture with the evidence while "sprinkling the gay thing in there." (Counter 1663**). Appellant characterizes this comment as a threat. However, this was a prediction of how the situation could look, and Appellant's

relationship with the victim was relevant to the investigation of Appellant or his wife, whom the detective again suggested was a suspect. The detective said the best state crime scene agent worked the scene and would examine the evidence collected to come to a conclusion, which could come down on him "like load of bricks." (Counter 171***). Notably, this seemed to be a prediction of future events, not a current expression. The detective told some story about a child telling the truth after breaking a lamp, adding: "our job is done. I mean we got a lot of shit to do but case closed." He then said, "This is your chance to get the truth out there." (Counter 175***). The detective promised to investigate and help prove Appellant's story. Appellant thereafter changed the story and said he not only heard but also saw the unidentified man shoot the victim, after which the man then threatened to kill Appellant and to expose the affair to Appellant's wife.

{¶60} Appellant asks this court to consider all of this and conclude the encounter turned custodial at the point the detective said it was time he called his "boss" to decide what to do (approximately 2.25 hours had elapsed since he entered the interview room). Around this time, the detective reiterated his thoughts about an elaborate cover-up, reiterating it may be starting to look like "a cold, calculated plan" by a "premeditated assassin." When he asked if Appellant wanted to "roll the dice" or tell the truth, Appellant then told the final story claiming it was self-defense.

{¶61} Appellant suggests a reasonable person would have considered themselves in custody after admitting to being present for the shooting by an unknown man, suggesting one may believe they were now in custody for lying to police in reporting the death. However, a reasonable person would not feel restrained to a degree equivalent to an arrest due to the disclosure that he ran away in fear after someone shot his friend.

{¶62} Appellant claims the reference to calling the boss would lead a reasonable person to conclude they could not leave. However, the reference to his boss was not in response to a query by Appellant (i.e., it was not in response to question as to whether he can leave). And, the comment could convey an impression that Appellant was not in custody and that the original status of the encounter had not changed from a consensual interview. Furthermore, the detective did not then leave the room or make a call. Plus, the detective disclosed he would investigate this new story even though he did not believe it. As stated above, "Even a clear statement from an officer that the person under

interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury*, 511 U.S. at 325. There was no objective indication the non-custodial situation had turned custodial at this point as no restraints on freedom associated with arrest had arisen.

{¶63} Appellant contends that at the very least, the detective should have provided *Miranda* warnings immediately after the self-defense story (approximately 2.5 hours into the interview) and before asking for a demonstration of the shooting. After the story but before the demonstration, the detective told Appellant that he did not consider the self-defense story "bullshit" (as he called the prior story). The detective said he had some things to work out and had some questions about this new story. When Appellant asked how his admission to the shooting helped him, the detective said he does not make the decisions and would consult with his boss, the local investigating officer from Bellaire, and the prosecuting attorney. (Counter 2314**). The detective said he did not think Appellant was a bad guy. He then had Appellant demonstrate the shooting.

{¶64} Contrary to Appellant's suggestion, the length of the interview was not so significant as to signal the situation had changed to custody. *See, e.g., State v. Mason*, 82 Ohio St.3d 144, 153-154, 694 N.E.2d 932 (1998) (finding *Miranda* not required where the defendant agreed to second interview at police station and was interviewed for four hours during which the door was not locked and the defendant was left alone at times); *Howes*, 565 U.S at 515 (five to seven hours of questioning lasting beyond a prisoner's regular bedtime was not custodial where it took place in a conference room without restraint and he could go back to his cell if he wanted).

{¶65} Appellant also urges that a reasonable person would have considered themselves in custody after admitting to the shooting. "[N]o Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation." *Locke v. Cattell,* 476 F.3d 46, 53 (1st Cir.2007). Here, Appellant went from seeking justice for his friend to blaming an unidentified man to admitting he shot the victim. Yet, he claimed to have done so *in self-defense* after disarming the victim but still during a fight/struggle. The mere fact that the suspect made incriminating statements during the interview, leading to his eventual arrest, does not convert a non-custodial interview into one which is custodial. *State v. Hess*, 5th Dist. Fairfield No. 2003-

CA-00098, 2004-Ohio-7311, ¶ 31; *State v. Isaac*, 2d Dist. Greene No. 2003-CA-91, 2004-Ohio-4683, ¶ 26. *See also Mason*, 82 Ohio St.3d 144 (where the defendant's statements were not directly incriminating but were used against him as they conflicted with other statements).

**{¶66}** As the test is objective, the test is not whether the particular defendant (who later ends up admitting his involvement) thinks he can leave but what a reasonable person would think. The test is sometimes framed as what a reasonable person, innocent of an offense, would think if being questioned. *See, e.g., United States v. Galloway*, 316 F.3d 624, 629 (6th Cir.2003); *State v. Barnett*, 2d Dist. No. 14019 (Aug. 31, 1994). In any event, the physical re-creation itself, whereby the detective allowed Appellant to touch him and place him in potentially risky positions, did not suggest the situation had transformed into a custodial one.

**{¶67}** The totality of the circumstances does not lead to a conclusion that the undisputedly voluntary police interview transformed into a custodial interrogation before the demonstration of the shooting, after which *Miranda* rights were provided. In other words, the disputed points in the hour after the detective's expression that he knew Appellant "had something to do with it" do not show a change in the level of restraint or the imposition of a restriction on Appellant to a degree associated with an arrest. A reasonable person would be hoping the detective believed the self-defense story, not thinking he was under arrest. This assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR: VOLUNTARY STATEMENT

**{¶68}** Appellant's fourth assignment of error contends:

"THE TRIAL COURT ERRE[D] IN FAILING TO SUPPRESS THE INTERROGATION VIDEO AS DEFENDANT-APPELLANT'S CONFESSION WAS INVOLUNTARY."

**{¶69}** As Appellant points out, whether a statement was voluntary is a separate inquiry from the evaluation of whether a person was subjected to a custodial interrogation for purposes of *Miranda*. *See Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed. 405 (2000). An involuntary statement is one where the defendant's will has been overborne and his capacity for self-determination has been critically impaired due to coercive police conduct. *State v. Nields*, 93 Ohio St.3d 6, 14, 752 N.E.2d 859

(2001). In order to determine voluntariness, one views the totality of the circumstances, which may include: age; mentality; prior experience with the criminal justice system; length, intensity, and frequency of interrogation; physical deprivation of food, water, medicine, or sleep; mistreatment; and improper threats or inducements. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996), citing *State v. Edwards*, 49 Ohio St.2d 31, 40-41, 358 N.E.2d 1051 (1976).

**{¶70}** Appellant sets forth facts such as: he was 30 years old, he graduated from high school, and he had one prior criminal matter (at age 19). He states the interview was long, intense, and emotionally-draining. He points to the detective's exaggerations and lies about the evidence discovered and says the detective "threatened" to paint him as a cold, calculated assassin and expose his homosexual affair to the public while suggesting the shooting was an accident. He also claims he could not sleep for the two days between the shooting and the interview.

**{¶71}** First, Appellant's suppression motion was based on whether the voluntary interview had turned custodial requiring mid-stream *Miranda* warnings. The motion did not contend Appellant's statement was involuntary. An evidentiary hearing was not held on the matter, where evidence on the various circumstances could have been presented. "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived." *State v. Shindler*, 70 Ohio St.3d 54, 58, 636 N.E.2d 319 (1994) ("in order to require a hearing on a motion to suppress evidence, the defendant must state the motion's legal and factual bases with sufficient particularity to place the prosecutor and court on notice of the issues to be decided"). *See also City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988) ("The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits"); Crim.R. 47 (the motion "shall state with particularity the grounds upon which it is made and shall set forth the relief or order sought. It shall be supported by a memorandum containing citations").

**{¶72}** Specifically, where a suppression motion is filed asserting that *Miranda* warnings were required due to a custodial interrogation, the state does not have the

burden at a suppression hearing on the distinct issue as to whether a statement was voluntary and a trial court does not commit error in failing to consider this issue if it was not raised at any point. *State v. Smith*, 7th Dist. Belmont No. 15 BE 0064, 2017-Ohio-2708, ¶52-54. In accordance, this issue of voluntariness has not been preserved.

**{¶73}** In any event, there is no evidence on the record requiring a decision that Appellant's statements were involuntary. Appellant was thirty years old with a high school degree and no signs of lacking intelligence. The interview was pre-planned at the scene. He was the person who reported the homicide, stating he arrived at the victim's house and discovered the body. Appellant came to the police station with his wife voluntarily two days after urging the detective to find the person who killed his best friend. The interview began in the evening, but it was not late at night at the time he admitted to the shooting. Appellant was given the choice as to whether he wanted to wait until the next day. He gave consent to search his phone. He had foreknowledge of the interest in his phone. (When police arrived at the scene, Appellant mentioned receiving text messages from the victim at various times throughout the day, which could help establish time of death and was advised to keep them.) At the beginning of the interview, Appellant was instructed of his rights regarding voluntary consent to search and the right to refuse said search in the absence of a search warrant.

**{¶74}** During the interview, Appellant acknowledged he came to the interview expecting he would have to discuss his affair with the victim. The length of the interview was not inordinate, especially considering he does not allege coercion in the first hour of the interview and the self-defense story began less than 2.5 hours into the interview. There was no deprivation or mistreatment. There was no need to consider providing food during this time. The detective provided water and paper towels (when Appellant initially cried as he expressed grief for the victim). Appellant points to his sobbing as a factor showing his vulnerability to coercion, but the detective testified he was not crying as much it he tried to make it appear.

**{¶75}** There was no sleep-deprivation as a result of the interview. Appellant states he did not sleep the prior two nights. The state's rebuttal witness testified Appellant reported this to him at a psychiatric examination months later. (Tr. 1210). A person's statement that he was unable to sleep after a shooting need not be taken as a literal claim

of zero sleep, even if Appellant mentioned this claim to the detective. Nor must it be taken as truthful. A sleep-deprived condition was not evident in his appearance during the police interview as he appeared alert and cognizant. Appellant's mentality appeared stable. There was no indication of drug or alcohol use. The intensity level may have felt personally high because of what was at stake, but the detective did not yell at or degrade Appellant. In fact, he used bonding tactics.

**{¶76}** An officer's use of deception about the evidence uncovered is not necessarily coercive. *See Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506 at ¶ 17 (where the police misled the defendant into thinking that the entire crime was on videotape). Predictions about how others may interpret the evidence are not threats. There were no improper inducements, and, a detective's admonitions to tell the truth are not improper. *See State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 29. *See also Edwards*, 49 Ohio St.2d at 41 (it was not coercive to advise the defendant to tell the truth or to avoid getting caught "holding the bag"). In sum, the totality of the circumstances does not require a finding that the defendant's will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *See Nields*, 93 Ohio St.3d at 14. Accordingly, this assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE: SPOUSAL PRIVACY

**{¶77}** Appellant's fifth assignment of error alleges:

"THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS, AND IN ADMITTING IN TO EVIDENCE, THE PORTION OF THE INTERROGATION VIDEO THAT SECRETLY RECORDED MARITAL CONFIDENCES IN VIOLATION OF THE FOURTH AMENDMENT."

**{¶78}** After the interview with the detective, the detective left and returned with another officer. Appellant was advised that he was in a different position now as he could face charges. Appellant was read his *Miranda* rights. Appellant then reviewed his story with the other officer and provided a written statement. Thereafter, Appellant was left in the room with his wife. The video system continued recording for the forty minutes they were alone together.

**{¶79}** Appellant told his wife the victim asked him to leave her, slapped him, and came at him with a gun. He said he was scared and did not know what to do, repeating his statement that he shot the victim, the victim landed on the ground, and he shot the victim again. Before the video interview was played to the jury at trial, defense counsel objected to playing the end of the recording during which Appellant was left alone with his wife. Counsel argued this contained privileged marital communications. (Tr. 925). The state cited the Ohio Supreme Court's *Perez* case. The court overruled the objection, and the entire recording was played at trial.

**{¶80}** In *Perez*, the Supreme Court held that a recorded conversation between spouses need not be excluded by the spousal privilege statute because it was not testimony and the face of the statute merely precludes a spouse from testifying to the other spouse's statements. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 113, 120, applying R.C. 2945.42. The Supreme Court also rejected claims the taped conversations violated his right against self-incrimination or denied him due process of law. *Id.* at ¶ 55-56, 123. On the latter topic, the Court pointed out "the marital-communications privilege does not derive from the United States Constitution." *Id.* at ¶ 123.

**{¶81}** Appellant acknowledges the *Perez* case but raises a Fourth Amendment argument, citing this court's *Clemons* case where we discussed the application of Fourth Amendment protections to a police interview room recording of spousal communications. The *Perez* case was not discussed in *Clemons*; although, *Perez* did not discuss the Fourth Amendment. Under general Fourth Amendment principles, a communication cannot be intercepted if there is an actual and justifiable expectation of privacy from the eye and ear of the government; therefore, an individual's subjective expectation of privacy is protected by the Fourth Amendment if that expectation is reasonable and justifiable. *State v. Clemons*, 7th Dist. Belmont No. 10 BE 7, 2011-Ohio-1177, ¶ 61, citing *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 13-14. In making this Fourth Amendment determination, the court must find: (1) the individual exhibited an actual expectation of privacy by conduct showing he wished to preserve the matter as private; and (2) this expectation of privacy is one which society is prepared to recognize

as reasonable. *Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

**{¶82}** The *Clemons* case involved the recording of a conversation between the defendant and his wife in an interview room at the Belmont County Sheriff's office after the defendant's arrest. The room had one-way glass (which was not being used at the time) and had a hidden camera in a power outlet. This court reviewed various cases cited by the parties and found no Fourth Amendment violation. We distinguished cases where an officer told the defendant his conversation with a visitor would not be recorded or where the officer shut off a recording system at the defendant's request but left behind a hidden recorder. *Clemons*, 7th Dist. Belmont No. 10 BE 7 at ¶ 66. Here, Appellant does not argue the detective assured him the conversation would not be recorded.

**{¶83}** Contrary to Appellant's suggestion, the mere fact that the one-way glass in the interview room was covered over with carpet does not require exclusion of the spousal conversation. The existence of the one-way glass was merely one of the facts mentioned in *Clemons* as leading a reasonable person to believe the communications would not be private; it was not held to be the dispositive ruling in the case. *See State v. Paige*, 7th Dist. Mahoning No. 17MA33, 2019-Ohio-1088, ¶ 62 (rejecting the argument that cases without one-way glass cannot rely on *Clemons*).

**{¶84}** Specifically, the decision in *Clemons* concluded by agreeing with the case law upholding the admission of conversations recorded from the back of a police car and by finding there was no reason to distinguish between a police interview room and the back of a police car for purposes of whether a person has an expectation of privacy. *Clemons*, 7th Dist. Belmont No. 10 BE 7 at ¶ 75. We pointed out both are owned and operated by the state for the express purpose of discovering crime and are often employed for the temporary custody of arrestees; the general public has no reason to meet with a confidante in a police interrogation room or to believe it is a sanctuary for private discussions as it is not the type of public place where one would reasonably expect his conversations will not be monitored. *Id.*

**{¶85}** Appellant notes the Eleventh District has expressed disagreement with this comparison and conclusion. *State v. Williams*, 11th Dist. Trumbull No. 2012-T-0053, 2013-Ohio-5076, ¶ 37. That court factually claimed that police cars usually have visible

Case No. 18 BE 0011

recording devices (aimed at the backseat occupants). The *Williams* court concluded: "The problem in this case is that the interrogation room contained no indicia that the activity could be monitored or recorded. * * * It is not reasonable to suggest that most people would expect a thermostat to be a video and audio recording and monitoring device. If the police truly believe that no reasonable person would have an expectation of privacy in such a room, the recording equipment should not need to be disguised."[1] *Id.* at ¶ 38. Nevertheless, the Eleventh District found the admission of a recording of the defendant speaking to his mother was harmless. *Id.* at ¶ 41.

{¶86} The holding in *Clemons* is the precedent followed in this district. The greater weight of authority continues to follow such precedent. *See United States v. Lattner*, E.D. Mich. No. 17-CR-20368 (Nov. 20, 2018). "It should not surprise anybody that they might be subject to surveillance in a police station, especially in an interrogation room. Whether the ultimate purpose is police safety or the collection and memorialization of information, a reasonable person would expect that police would be keeping a close eye on the goings-on of their stationhouse." *Id.*

{¶87} Furthermore, as the state alternatively points out, it was not the recording of the conversation with his wife that led to Appellant's conviction. A constitutional error in admitting certain evidence is harmless beyond a reasonable doubt when "the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus. The disputed portion of the recording was duplicative and was harmless beyond a reasonable doubt after the jury viewed the original interview with the demonstration and the second interview during which Appellant wrote his final statement.

{¶88} In any event, there is also no dispositive conflict with the Eleventh District's *Williams* case as the matter was raised in a suppression motion and heard by the trial court in *Williams*. Here, the issue of whether there was a subjective and a reasonable

---

[1] To the contrary, there are various reasons to refrain from exposing a recording device. An interviewing officer attempts to build a rapport with a witness or suspect and is expected to elicit important information. A visible camera can interfere with natural responses while a person is speaking to the officer, during which interview there is no reasonable expectation of privacy. Also, it may be considered risky to leave exposed and expensive equipment in a room where unknown entities are often left alone as the equipment could be vulnerable to destruction. The observation also appears overly focused on a uniquely hidden camera without consideration of the practice of audible recordings where rooms are merely wired for transmission for observers located elsewhere.

expectation of privacy in the police interview room was not presented to the trial court. Counsel objected at trial based on spousal privilege, which is a statutory privilege dealing with testimony. A Fourth Amendment suppression issue was not raised. Appellant's brief cites to his suppression motion; however, his motion to suppress did not raise this issue. (As aforementioned, the motion sought suppression of his statement on the grounds the interview turned custodial before the *Miranda* warnings were provided.)

**{¶89}** Thus, there was no pre-trial motion raising the matter and no hearing on the allegations where the evidence on the circumstances surrounding the room could have been presented. (For all we know, there are signs posted upon entering the police station or approaching the interview room warning about recordings occurring. Appellant essentially asks us to presume the recording device was hidden, suggesting this was the same room as in the *Clemons* case but with the one-way glass covered.) As stated under the prior assignment of error, the state has the right to be informed of the grounds on which suppression of evidence is sought and the trial court does not err by failing to suppress evidence on a ground not raised or heard. *Shindler*, 70 Ohio St.3d at 58; *Smith*, 7th Dist. Belmont No. 15 BE 0064 at ¶52-54. For all of the foregoing reasons, this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR SIX: GRAND JURY TRANSCRIPT</u>

**{¶90}** Appellant's sixth assignment of error argues:

"THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENSE COUNSEL ACCESS TO THE GRAND JURY TRANSCRIPT."

**{¶91}** A week after he was indicted, Appellant filed a motion for disclosure of witnesses who testified before the grand jury and a motion for transcription of the grand jury proceedings. He asked to be provided with a copy of the transcript or alternatively for the court to conduct an in camera inspection of the transcript and to seal it for appellate review. The reason provided for seeking the transcript was that those who testified before the grand jury may have made inconsistent statements in the past or may testify inconsistently at trial and the transcript would help prepare for trial. He also claimed that evidence of prior calculation and design was lacking at the preliminary hearing.

**{¶92}** At a hearing, the state agreed to disclose the names of the witnesses who testified before the grand jury. The court found the defense presented no particularized

need for the grand jury transcript, but agreed to order and read the transcript in case a particularized need arose later. (6/27/17 Tr. 14). Counsel asked the court to hold the motion in abeyance, and the court explained the motion would be considered withdrawn without prejudice but could be reactivated by seeking a hearing on it. (6/27/17 Tr. 14-15). The trial court conducted an in camera review of the grand jury transcript. (8/17/2017 J.E.). Appellant's brief states the issue was re-raised at trial in chambers. He cites to the sentencing transcript where he placed on the record that he requested the grand jury transcript during trial claiming his particularized need was based on "the new DNA, the touch DNA findings, and the gunshot residue relative to the camo hat." The court indicated this request had occurred as recited. (Sent.Tr. 22-23).

**{¶93}** On appeal, Appellant states he demonstrated a particularized need because: the DNA report from the swabbed drawer handles was not completed until December 18, 2017; the state presented a theory about a staged robbery scene at trial; and the test result showing gunshot residue on the victim's hat was not reported until December 21, 2017, which caused the forensic pathologist to change his opinion on the muzzle distance for the first wound. If these facts were not known by the grand jury witnesses, Appellant believes their testimony was likely inconsistent with these facts.

**{¶94}** Because grand jury proceedings are secret, the defendant is not entitled to grand jury transcripts before or during trial unless the ends of justice require it and the defense demonstrates a particularized need for disclosure which outweighs the secrecy need. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 141. There is a particularized need when the circumstances show a probability that the defendant will be denied a fair trial if he does not receive the grand jury transcript. *Id.* A particularized need is not demonstrated by an allegation the grand jury issued an indictment on the basis of inadequate or incompetent evidence. *State v. Davis*, 38 Ohio St.3d 361, 365, 528 N.E.2d 925 (1988).

**{¶95}** Moreover, it is insufficient to generally claim the grand jury testimony would allow the defense to fully confront accusers as it might aid cross-examination or it may contain material evidence. *Id.* at ¶ 142; *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 44 ("speculative claim that the grand jury testimony might have contained material evidence or might have aided his cross-examination does not

establish a particularized need"); *State v. Webb*, 70 Ohio St.3d 325, 337, 638 N.E.2d 1023 (1994) (rejecting claim that grand jury testimony might have aided cross-examination by revealing contradictions). The decision on a claim of particularized need is within the trial court's discretion. *Id.*

{¶96} Contrary to Appellant's contention, the staged robbery theory existed from the beginning of the case. As the state notes, Appellant pointed out the condition of the drawers at the scene as the reason his wife instructed him to retrieve his gun and why he entered the house with his gun drawn. There is also no indication this topic was raised to the trial court as support for a particularized need or how it could imply inconsistencies. (Sent.Tr. 22-23). As for forensic testing, the mere fact that relevant scientific test results are returned after an indictment does not provide a particularized need for grand jury transcripts. If the test of the drawer handles was not yet complete at the time of indictment, there would be no reason to testify about results at the grand jury hearing.

{¶97} As for a changed opinion based on new information, the jury heard the forensic pathologist who conducted the autopsy opine the first wound may be a contact wound and then heard him change his opinion to intermediate range (but still less than 6 inches away) after learning a hat with two holes had been tested and discovered to have gunshot residue. He did not testify before the grand jury. There was no indication the grand jury testimony was needed because the pathologist learned about a test conducted after the indictment.

{¶98} Finally, a review of the grand jury transcript by this court establishes the trial court did not err in refusing to disclose the transcript based on the allegations of particularized need relayed to the court or for any other reason. There is no indication the non-disclosure of the transcript affected the fairness of the trial, and the ends of justice did not call for disclosure in this case. In accordance, this assignment of error is overruled.

ASSIGNMENT OF ERROR SEVEN: CHALLENGE FOR CAUSE

{¶99} Appellant's seventh assignment of error alleges:

"THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO DISMISS TWO VENIREMEN FOR CAUSE."

{¶100} Crim.R. 24(C) provides the reasons for challenging a juror for cause, including if "the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state" or "is otherwise unsuitable for any other cause to serve as a juror." Crim.R. 24(C)(9),(14). The rule adds: "but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." Crim.R. 24(C)(9).

{¶101} During voir dire, a trial court has broad discretion in determining a juror's ability to be fair and impartial, and the court's decision on a challenge for cause will not be reversed unless the court clearly abused its discretion. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 73; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 33. An abuse of discretion involves an attitude that is unreasonable, arbitrary, or unconscionable. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 46. A decision is considered unreasonable if there is no sound reasoning process to support it. *Id.* The reviewing court defers to the trial court's decision where a prospective juror was challenged for bias as the trial judge has the opportunity to personally view and hear the prospective juror during voir dire. *Trimble*, 122 Ohio St.3d 297 at ¶ 73.

{¶102} Appellant challenges whether two jurors were biased. First, Appellant claims the trial court should have found cause to dismiss a juror who was a former police officer. As the state points out, the mere fact a juror is a former police officer does not rise to the level of a challenge for cause. *See State v. Murphy*, 91 Ohio St.3d 516, 527, 747 N.E.2d 765 (2001) (allowing a current police officer to remain on the jury); *State v. McGlothin*, 1st Dist. No. C-060145, 2007-Ohio-4707, ¶ 11-12 (finding the trial court did not err in refusing challenge to a retired police officer who insisted he would be a fair and impartial juror).

{¶103} In the Supreme Court's *Murphy* case: the juror was an active police officer who said "honor" would require him to follow the judge's instructions; he said, "I will hear the case as the facts are presented to me. I can't change who I am. * * * I don't feel it would be slanted. Maybe somebody else would think it would be"; defense counsel asked

what he thought about being in law enforcement and serving as a juror in an aggravated murder case; and the juror answered, "I don't know. If I was you guys, I wouldn't want me here, but that's your decision." *See Murphy*, 91 Ohio St.3d at 527. The Court upheld the decision to allow the police officer to remain on the jury as he indicated he could be impartial. *Id.*

**{¶104}** Appellant generally states the juror demonstrated a state of mind evincing enmity or bias toward the state. However, the juror was questioned by the state, the defense, and the court as to whether he was biased. He was formerly an officer in a different village in the same county. He changed professions two years prior. He said he had no current relationship with law enforcement and could understand both sides. (Tr. 28-29). When defense counsel asked if he could be fair and impartial considering his law enforcement training, the juror answered that he did "not play unfair." (Tr. 130). He agreed his law enforcement background was part of his life experience. The court began questioning him, and he told the court he was not biased and could judge the case based solely on the evidence presented in the courtroom and law provided by the court. (Tr. 132-133). When asked about having a gun drawn on him in the past, he insisted he could be fair and impartial and not bring that experience into court. (Tr. 134).

**{¶105}** There is no indication the court abused its discretion in refraining from excusing this juror. In any event, this juror was removed due to issues with falling asleep during trial. He was replaced by an alternate juror, and the defense did not use its available peremptory challenge for alternate jurors. (Tr. 234). As the former police officer did not participate in the verdict, prejudice is not apparent.

**{¶106}** The second juror Appellant claims was biased was a pastor who answered a question from the prosecution by saying he would do his best to be fair and impartial and would "have to try my best to set aside" his feelings on same sex relationships. (Tr. 144-145). When the court asked if he was saying he could not set his feelings aside and judge the case based on the evidence and law, he answered: "Yeah. I could set it aside. I understand. I could set it aside. Yeah." (Tr. 145). The court restated the question and the juror provided the same answer. He expressed a belief he was the type of juror both sides would want, stating he is good at listening to both sides and making fair decisions. (Tr. 147).

Case No. 18 BE 0011

**{¶107}** Defense counsel asked about his sermons on same-sex marriage. The pastor said he preached from the Biblical standpoint that the decision was a choice rather than a trait at birth and led to various problems. (Tr. 148-149). Defense counsel spoke to the juror about whether he could separate the moral issue from the facts of the case. (Tr. 150-151). The court then asked: "Can you set aside your Biblical feelings or beliefs regarding a homosexual relationship and judge this case regarding the murder charge just on the facts and evidence and law presented in this courtroom?" The juror responded, "Yes. I mean I understand the responsibility to set it aside." (Tr. 151). The court concluded: "All right. Thank you. If we can move on, then, please." The topic was not subsequently discussed.

**{¶108}** Soon thereafter, the pastor was removed from the jury when Appellant exercised his first peremptory challenge. (Tr. 163). Appellant nevertheless points out that he exhausted all four of his peremptory challenges during jury selection. He concludes he was forced to "waste" a peremptory challenge on the pastor due to the trial court's failure to excuse the pastor for cause.

**{¶109}** "[I]f the defense peremptorily excuses the biased prospective juror, but the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial." *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997). We note the use of the word "may" in this holding. Yet, the Court later reiterated this holding and added an observation from an older case: "[i]f the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged venireman with a peremptory challenge *and* exhausts his peremptory challenges before the full jury is seated." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 87.

**{¶110}** Besides the former police officer, Appellant does not specify what juror he would have removed had the court dismissed the pastor for cause. However, as pointed out above, the former police officer was replaced by one of the two alternates whom Appellant did not challenge (by utilizing his additional, alternate peremptory challenge). These circumstances would eliminate any constitutional claim. *State v. Broom*, 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988) ("in order to state a constitutional violation in this situation, the defendant must use all of his peremptory challenges and demonstrate that

Case No. 18 BE 0011

one of the jurors seated was not impartial"). *See also Rivera v. Illinois*, 556 U.S. 148, 161, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) (deprivation of peremptory challenge does not require automatic reversal but requires showing of prejudice).

**{¶111}** To the extent a claim under state statutory law or Crim.R. 24 is asserted as requiring reversal merely because all peremptory challenges were exhausted,[2] a party waives any potential error by failing to challenge the prospective jurors at trial. *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). Appellant claims the trial court informed counsel to "look" at the court when it wished the court to consider a challenge for cause. (Apt.Br. fn. 43). This may have prompted the court's questioning of the two jurors now contested; however, after hearing the court's questioning and the responses thereto, defense counsel moved on without placing an objection into the record at that point or later during peremptory challenges or the seating of the jury. (Tr. 134, 151). Accordingly, the trial court may have believed defense counsel was satisfied with the answers provided upon inquiry of the jurors, at least for purposes of a challenge for cause. The trial court inquired about whether counsel needed to approach the bench for cause at other times, including before the exercise of the first peremptory challenge. (Tr. 162, 212, 232). This counters the claim that the trial court did not want an oral objection as to a juror.

**{¶112}** In any event, the trial court did not abuse its discretion in failing to remove the pastor after hearing the pastor express that he could set aside his Biblical issue with homosexuality, which would have applied to both the victim and the defendant. Notably, the trial court excused a different juror who had a moral issue with homosexuality and who could not assure the court he could be totally fair and impartial to the defendant. (Tr. 142). "The trial judge had the benefit of observing [the juror's] demeanor and body language, while we do not. Finding no abuse of discretion, we therefore defer to the trial

---

[2] Whether an error in denying a challenge for cause is reversible merely because the defendant used all peremptory challenges is left for the states. *See Rivera v. Illinois*, 556 U.S. 148. It is not automatically reversible under federal law. *United States v. Martinez–Salazar*, 528 U.S. 304, 317, 313, 317, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (right to peremptory challenge is not impaired where the defendant must use one to cure error in denying a challenge for cause). There are few instances where a party need not show an error was prejudicial in order to prevail; reversible-per-se structural error applies to a very limited class of errors where the fairness of a proceeding as a whole is undermined by a constitutional error. *See Premier Therapy, LLC v. Childs*, 7th Dist. No. 14 CO 0048, 2016-Ohio-7934, 75 N.E.3d 692, ¶ 38-45; *State v. Jones*, 1st Dist. No. C-170358, 2018-Ohio-4754, ¶ 18-26 (refusing to adopt an automatic-reversal remedy).

judge's discretion to determine whether [the juror] could indeed follow the law and be fair and impartial." *Williams*, 79 Ohio St.3d at 8. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR EIGHT: MURDER INSTRUCTION</u>

**{¶113}** Appellant's eighth assignment of error contends:

"THE TRIAL COURT'S JURY CHARGE WAS IN ERR[O]R AS IT REQUIRED THE JURY TO UNANIMOUSLY AGREE ON THE CHARGE OF AGGRAVATED MURDER BEFORE CONSIDERING A LESSER INCLUDED OFFENSE."

**{¶114}** An "acquittal first" instruction involves charging the jury it must unanimously find the defendant not guilty of the greater offense in order to then deliberate on the lesser offense. In Ohio, the jury is not required to unanimously determine the defendant is not guilty of the charged offense before considering a lesser included offense. *State v. Thomas*, 40 Ohio St.3d 213, 220, 533 N.E.2d 286 (1988). The Supreme Court found acquittal first instructions exacerbate the risk of a coerced verdict and should not be provided. *Id.* (although the jury can be instructed to consider the greater offense first).

**{¶115}** Instructions are not improper on this ground merely because they are "ambiguous as to the circumstances under which the jury was to consider the lesser included offense of murder." *Id.* The *Thomas* Court found the following instructions were fairly ambiguous and not ideal but were not reversible:

> If you find that The State has proven beyond a reasonable doubt all of the essential elements of the crime of aggravated murder, then your verdict must be that the Defendant is guilty of aggravated murder; and you will not consider the lesser offense.
>
> However, if you find that The State has failed to prove beyond a reasonable doubt the element of prior calculation and design, then your verdict must be that the Defendant is not guilty of aggravated murder.
>
> You will then proceed with your deliberations and decide whether The State has proven beyond a reasonable doubt all of the essential elements of the lesser crime of murder.

<u>Case No. 18 BE 0011</u>

*Id.* The *Thomas* Court advised a better instruction would incorporate "inability to agree" language (in order to explicitly advise the jurors they could consider the lesser included offense if they found the defendant not guilty of the greater offense *or* if they could not agree on that offense). *Id.* at 220-221.

**{¶116}** Appellant argues the trial court improperly gave an "acquittal first" instruction and suggested to the jury they had to unanimously find him not guilty of aggravated murder before considering the charge of murder. Initially, the trial court stated:

> If you find that the state failed to prove beyond a reasonable doubt all of the essential elements of aggravated murder, then your verdict must be not guilty of that offense as stated; and in that event, you will continue your deliberations to decide whether the State has proved beyond a reasonable doubt all of the essential elements of the lesser included offense of murder, with a firearm specification, which is the same as aggravated murder but without the elements of prior calculation and design.

(Tr. 1230-1231).

**{¶117}** Appellant seems to agree that an instruction such as this does not expressly require an acquittal before considering the lesser included offense but merely advises how to proceed if the jury were to find the defendant not guilty of the greater offense. *See State v. Taylor*, 78 Ohio St.3d 15, 28-29, 676 N.E.2d 82 (1997) (an improper "acquittal first" instruction was not provided merely because the court did not advise how to proceed if they could not all agree on a life or death sentence). It is well-establish this is not an "acquittal first" instruction. *State v. Mason*, 82 Ohio St.3d 144, 160-161, 694 N.E.2d 932 (1998) (upholding: "If you find the Defendant not guilty of Aggravated Murder, you will then continue with your deliberations and determine whether or not the State of Ohio proved beyond a reasonable doubt all the essential elements of the lesser crime of murder"); *State v. Allen*, 73 Ohio St.3d 626, 638, 653 N.E.2d 675 (1995).

**{¶118}** Appellant then asks this court to consider the trial court's instructions on how to complete the verdict forms. The court noted the first verdict form had "Guilty or Not Guilty" printed underneath a blank line on which the jury would insert their choice if they all agreed. The court stated: "And then if you find him guilty of aggravated murder,

you jump to the gun specification; you don't even go to the issue of murder." Next, the court explained if the jury found the defendant not guilty of aggravated murder, it would proceed to the second verdict form to determine if he was guilty or not guilty of the lesser included offense of murder. (Tr. 1235). Within the context of the instructions as to the verdict forms, the court then concluded: "So, again, you go first to the issue of aggravated murder. You either find him guilty or not guilty of aggravated murder. If you find him guilty of aggravated murder, you then go to the firearm specification, skipping the murder form. If you find him not guilty of aggravated murder, you go to the murder form * * *." (Tr. 1236).

{¶119} First, the failure to add language on what to do if the jury was "unable to agree" on the indicted offense could have been addressed before the instructions were read to the jury, as the phrase was not in the written charge which was previously provided to the attorneys. (Tr. 1218). *See* O.J.I. 413.21 ("If all of you are unable to agree on a verdict of either guilty or not guilty of (the greater offense), then you will continue your deliberation to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of * * *"). The failure to add this instruction is not plain error. *See, e.g., Taylor*, 78 Ohio St.3d at 28-29 (finding the defendant should have asked the judge to instruct the jury it was not required to determine unanimously that the death sentence was inappropriate before considering a life sentence; "Although the instruction appellant now seeks may be a desirable one, its absence was not plain error").

{¶120} Appellant believes the explanation regarding the verdict forms and the recap with the addition of "You either find him guilty or not guilty of aggravated murder" is akin to an acquittal first instruction when read with the other quoted portions of the instructions. He notes the final statement was not in the written charge. However, there was no objection to the jury instruction on this ground after the instructions were read to the jury and counsel was asked to voice any objections. (Tr. 1241). "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). The failure to object after the instruction was given combined with the failure to seek "inability to agree" language

earlier constitutes waiver and is not reversible absent a finding of plain error. *See Mason*, 82 Ohio St.3d at 160.

**{¶121}** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To recognize plain error, the appellate court must find an obvious error which prejudiced the appellant by affecting his substantial rights; this requires a finding that there is a "reasonable probability that the error resulted in prejudice." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. An appellate court's invocation of plain error is discretionary. *Id.* at ¶ 23.

**{¶122}** Notably, instructions on how to fill out a verdict form have a different function than instructions on the elements and how to proceed during deliberations. As the court pointed out, the verdict forms are to be completed after the jury has deliberated and reached a verdict. (Tr. 1236-1237). The statement, in the oral and written instructions, that the jury need not complete the murder verdict form if they found the defendant guilty of the indicted offense of aggravated murder does not present an "acquittal first" issue. Furthermore, the extemporaneous recap that a verdict form contains two choices does not equate to an acquittal first instruction. Each challenged statement must be read in context of the overall charge. *State v. Madrigal*, 87 Ohio St.3d 378, 396, 721 N.E.2d 52 (2000).

**{¶123}** The trial court may not have provided the ideal instruction which would have explained what to do if they could not unanimously agree on the aggravated murder offense. *Thomas*, 40 Ohio St.3d at 220-221 (advising the ideal instruction would insert "or are unable to agree" after "if you find him not guilty"). And, certain statements about the completion of the verdict forms, when read alone, may appear ambiguous. However, the court did not specify that the jury had to vote unanimously to acquit Appellant of aggravated murder before deliberating on the lesser included offense of murder. *See Mason*, 82 Ohio St.3d at 160-161; *Taylor*, 78 Ohio St.3d at 28-29; *Allen*, 73 Ohio St.3d at

638. The court did not instruct that a hung jury on the indicted count prohibited consideration of the lesser included count. An ambiguous instruction that fails to mention what to do if there is an inability to agree does not equate to an acquittal first instruction. *Id.* Reading the disputed portion of the instruction in context, plain error is not apparent. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NINE: VOLUNTARY MANSLAUGHTER</u>

**{¶124}** Appellant's ninth assignment of error provides:

"THE TRIAL COURT ERRE[D] AND ABUSED ITS DISCRETION IN FAILING TO GIVE THE REQUESTED CHARGE OF VOLUNTARY MANSLAUGHTER."

**{¶125}** In discussing the written charge provided to the parties, Appellant's attorney stated that in addition to instructions on the lesser included offense of murder and the affirmative defense of self-defense, he wanted an instruction on voluntary manslaughter. (Tr. 1219). The state disagreed, arguing the defendant's statement focused on fear rather than anger. (Tr. 1222-1223). Defense counsel acknowledged that fear would be insufficient but urged that an inference of anger can be made. (Tr. 1223-1224). The court refused to give a voluntary manslaughter instruction. Defense counsel renewed his objection after the court reviewed the instructions with the jury. (Tr. 1242).

**{¶126}** Voluntary manslaughter is defined as knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force * * *." R.C. 2903.03(A). Voluntary manslaughter is an inferior-degree offense to aggravated murder (and murder) as its elements are contained within the greater offense but it has mitigating elements as well. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274 (1992) (rather than a lesser included offense). When a defendant is tried for a greater offense such as murder and the defendant is hoping for a verdict on voluntary manslaughter, the defendant must establish by a preponderance of the evidence the existence of one or both of the mitigating circumstances. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 153; *State v. Rhodes*, 63 Ohio St.3d 613, 617, 590 N.E.2d 261 (1992).

**{¶127}** In general, a defendant is entitled to an instruction on an inferior degree offense when the evidence presented at trial would reasonably support both an acquittal

<u>Case No. 18 BE 0011</u>

on the charged crime and a conviction of the inferior degree. *Shane*, 63 Ohio St.3d at 632 (the same test as applied when considering a lesser included offense instruction). The trial court's decision on whether a voluntary manslaughter instruction was warranted is reviewed for an abuse of discretion. *Thompson*, 141 Ohio St.3d 254 at ¶ 152.

**{¶128}** Voluntary manslaughter has both an objective component (involving whether a serious provocation occurred and was sufficient to arouse the passions of an ordinary person beyond the power of his control) and a subjective component (involving whether this defendant was actually under the influence of sudden passion or in a sudden fit of rage). *Id.* at ¶ 153. The Supreme Court found almost all the evidence cited by the defendant in *Thompson* involved his fear the victim would harm him and held that evidence a defendant feared for his personal safety is insufficient to demonstrate the emotional state necessary to constitute sudden passion or fit of rage. *Id.* at ¶ 155-157 (where a police officer slammed the defendant on his car hood and threatened to let loose his dog, which had been acting overly aggressive, and where a witness testified she feared for the defendant's life). In upholding the refusal to instruct on voluntary manslaughter, the Supreme Court observed: "nothing in the record indicates that [he] actually was in a fit of passion or rage on the night in question." *Id.* at ¶ 159 (noting there was no evidence providing insight into the defendant's actual state of mind or level of agitation at the time of the shooting).

**{¶129}** Appellant points to the evidence from his interview mentioning how the victim yelled at him, slapped at him, and waved a gun around. He notes the relationship between himself and the victim and points to the subject of their argument, including the end of the relationship, Appellant's wife, and missing money.

**{¶130}** In the interview, Appellant said he felt threatened even after obtaining the gun from the allegedly armed victim (who was ten inches shorter than Appellant). The detective specifically asked Appellant if he was angry, and he responded, "a little bit but * * *." (Counter 2408**). When the detective interjected, "I'd be pissed too," Appellant said, "I felt threatened." Appellant then asked, "What would you have done if someone pulls a gun out on you and starts waving it at you?" He thereafter reiterated he was "scared" because the victim was waving a gun. (Counter 2461**).

**{¶131}** When he retold the story to another officer, he said the victim was irate, but he did not describe himself in similar vein. (Counter 2859**). He then provided a written statement which said he was "scared and worried" while the victim was waving the gun and then said, "I was scared and freaked out when he came at me with the gun so I protected myself." He explained what he did immediately after the shooting: "I panic[k]ed and left. I was scared and didn't know what to do other than throw the gun * * *." His comments to his wife also contained a statement that he was scared, with no hint of anger.

**{¶132}** Furthermore, Appellant's expert was permitted to relate the story he told her months after the shooting. She testified Appellant told her "he was fearful for his life as a result of the gun being pointed at him." (Tr. 1135). He told the state's rebuttal expert he was scared as well. (Tr. 1172).

**{¶133}** There was no expression of Appellant subjectively being under the influence of sudden passion or of being in a sudden fit of rage and no evidence indicating this subjective component. Appellant described the victim as upset (because Appellant was breaking up with him, only wanted to be friends, and would not leave his wife for the victim). However, he consistently characterized his own mental state as fearful. *See State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2012-Ohio-5256, ¶24 ("voluntary manslaughter requires proof that the defendant, not the victim, acted out of a fit of sudden passion or rage"). A defendant's presentation of evidence that he feared for his personal safety is insufficient to demonstrate the emotional state necessary to constitute sudden passion or fit of rage. *Thompson*, 141 Ohio St.3d 254 at ¶ 155-157. *See also Williams*, 7th Dist. Jefferson No. 11 JE 7 at ¶ 24 ("an instruction on voluntary manslaughter is generally incompatible with and contradictory to a defense of self-defense"); *State v. Marcum*, 7th Dist. Columbiana No. 04 CO 66, 2006-Ohio-7068, ¶ 46 ("a self-defense theory is usually contradictory to proof of sudden passion or rage"). As in the Supreme Court's recent *Thompson* case, there was no evidence providing insight into the defendant's actual state of mind or level of agitation at the time of the shooting (besides fear) and "nothing in the record indicates that [he] actually was in a fit of passion or rage on the night in question." *Id.* at ¶ 159. This assignment of error is overruled.

ASSIGNMENT OF ERROR TEN: SENTENCING

{¶134} Appellant's tenth and final assignment of error provides:

"AS APPLIED, R.C. §2953.08(D)(3) VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS SECTIONS 1, 2, 9, 16 AND 19 OF THE OHIO CONSTITUTION."

{¶135} At sentencing, the available sentences for the aggravated murder verdict were: (a) life without parole; (b) life imprisonment with parole eligibility after serving twenty years of imprisonment; (c) life imprisonment with parole eligibility after serving twenty-five full years; or (d) life imprisonment with parole eligibility after serving thirty full years. R.C. 2929.03(A)(1)(a)-(d). Appellant was sentenced to life without parole.

{¶136} "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." R.C. 2953.08(D)(3). We note an appellate court is also prohibited from reviewing a joint sentence by division (D)(1), which provides: "A sentence imposed upon a defendant is not subject to review under this section if the sentence is authorized by law, has been recommended jointly by the defendant and the prosecution in the case, and is imposed by a sentencing judge."

{¶137} In the past, these provisions were both in one division, and the Supreme Court was asked to determine whether aggravated murder and murder were unreviewable under the entire statute or whether the word "section" merely referred to the division. In finding the language unambiguous, the Court declared the statutory provision ("A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section") "clearly means what it says: such a sentence cannot be reviewed." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 17.

{¶138} The Court agreed with the Eighth District's holding in *State v. Hollingsworth*, 143 Ohio App.3d 562, 758 N.E.2d 713 (2001): "a sentence imposed for aggravated murder is not subject to review by a court of appeals." *Porterfield*, 106 Ohio St.3d 5 at ¶ 18. The Supreme Court concluded: "* * * R.C. 2953.08(D) clearly precludes review of individual murder sentences imposed pursuant to R.C. 2929.02 to 2929.06 * * *." *Id.* at ¶ 19 (but finding the consecutive nature of two murder sentences could be

reviewed). In support of a holding that there is no other type of appellate review besides through this statute, courts often point to a statement that R.C. 2953.08 "specifically and comprehensively defines the parameters" of appellate review for felony sentences, which was made in the recent case of *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21.

**{¶139}** Appellant argues the unreviewability of his aggravated murder sentence violates the Eighth Amendment and its counterpart in the Ohio Constitution, Article I, Section 9. He relies on comments made in a "Statement of Justice SOTOMAYOR respecting the denial of certiorari" in an appeal from an Ohio case. In *Campbell*, the defendant initially argued the trial court imposed a sentence of life without parole for aggravated murder without first considering the statutory factors set forth in R.C. 2929.12. The Eighth District found the sentence unreviewable pursuant to R.C. 2953.08(D)(3). *State v. Campbell*, 8th Dist. No. 103982, 2016-Ohio-7613, ¶ 16. The court said there is no constitutional right to appellate review of a criminal sentence and the only right to appeal is the one provided by statute. *Id.* at ¶ 14 (and also found a consecutive sentence issue moot where the aggravated murder sentence was life without parole.)

**{¶140}** The Ohio Supreme Court declined to accept the appeal for review. *State v. Campbell*, 149 Ohio St.3d 1464, 2017-Ohio-5699, 77 N.E.3d 988. The United States Supreme Court denied the defendant's petition for a writ of certiorari without opinion. *Campbell v. Ohio*, __ U.S. __, 138 S.Ct. 1059, 200 L.Ed.2d 502 (2018). One justice, however, made comments on the Eighth Amendment, stating the parallels between a death sentence and a sentence of life imprisonment without parole may raise Eighth Amendment concerns with Ohio's statute making the latter sentence unreviewable.

> Our Eighth Amendment jurisprudence developed in the capital context calls into question whether a defendant should be condemned to die in prison without an appellate court having passed on whether that determination properly took account of his circumstances, was imposed as a result of bias, or was otherwise imposed in a "freakish manner." And our jurisprudence questions whether it is permissible that Campbell must now spend the rest of his days in prison without ever having had the opportunity to challenge why his trial judge chose the irrevocability of life without parole over the

hope of freedom after 20, 25, or 30 years [which the trial judge could have chosen to impose].

*Campbell*, __ U.S. __, 138 S.Ct. at 1060 ("Statement" by Justice Sotomayor). This justice also said the defendant failed to raise the Eighth Amendment issue below (footnoting that he raised only equal protection and due process) and opined Ohio courts should be vigilant in considering the Eighth Amendment issue in the appropriate case. *Id.* at 1061, fn.3.

**{¶141}** Appellant utilizes these observations to contend the application of R.C. 2953.08(D)(3) to his sentence of life without parole would violate the Eighth Amendment (prohibiting cruel and unusual punishment) because the trial court was biased against him and his history did not suggest such a lengthy sentence was appropriate. In attempting to show the trial court's animus against him, he first cites comments made at a bond hearing nine months before sentencing. He contests the court's excessive volume and the "disdain dripping" from the court's comments about the impact of witnesses put on by the defense in favor of bond reduction. Yet, the court validly noted the state's case showed the defendant led a secret dual life and took his own wife and daughter to the scene of the shooting to discover the body. (Bond Hrg. 104-105). In addressing risk of flight, the question of how well a bond witness really knew the defendant is pertinent. Appellant states bias can be seen in the court's characterization of his dual life as "peculiar" and stating he lied "through his teeth to his wife and child" (when he took them to the scene). However, these comments made at a bond hearing in response to contentions he was not a flight-risk are not concerning.

**{¶142}** Furthermore, alleged bias of the trial court must be addressed by an affidavit of disqualification filed in the Ohio Supreme Court. R.C. 2701.03(A). The appellate court generally lacks jurisdiction to reverse judgments based upon bias. *See Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978). This applies not only to events allegedly indicating bias before and during trial but also to comments at sentencing. *State v. Power*, 7th Dist. Columbiana No. 12 CO 14, 2013-Ohio-4254, ¶ 13-21 (with an exception for comments during trial if a court's bias influenced the jury).

**{¶143}** Appellant next presents an example of alleged bias occurring during a side bar. Defense counsel had asked a witness if he was aware a forensic pathologist determined the second shot could not have created the wounds. (Tr. 1192). Appellant complains the trial court loudly said the question was "a mischaracterization" of prior testimony. Defense counsel objected to the court making this comment in front of the jury. (Tr. 1193). The court responded: "that was not in front of the jury. Now, as you two are walking away, I may have spoken too loud * * *." The court then instructed the jury to disregard any comments overheard during the sidebar. (Tr. 1194). Any issue with the jury was cured. In any event, the use of the word "mischaracterization" did not indicate bias. Notably, the witness did not make a blanket statement that the second shot could not have created the wound; such opinion was qualified and related to whether it could have created the wound if Appellant was standing straight up and the victim was on the ground.

**{¶144}** Finally, Appellant turns to the sentencing hearing. Under rare circumstances, biased comments at sentencing can be reviewed for due process violations, but this is reserved for extreme cases or those involving a constitutionally protected status. *State v. Corchado*, 7th Dist. Mahoning No. 16 MA 0155, 2017-Ohio-4390, 93 N.E.3d 150, ¶ 14, citing *Power*, 7th Dist. Columbiana No. 12 CO 14 and *State v. Arnett*, 88 Ohio St.3d 208, 218, 724 N.E.2d 793 (2000) (addressing a comment alleged to involve religion). Appellant does not specify this principle, instead relying on the Sotomayor statement on concerns of bias when issuing a life without parole sentence as potentially implicating the Eighth Amendment.

**{¶145}** Although the record does not indicate volume or tone, Appellant states the trial judge had so much animosity that he even yelled at the prosecutor for mentioning a preferred phrasing as to the sentence on the firearm specification. Appellant characterizes the court's comments at sentencing as a "tirade" lacking in meaningful analysis of relevant mitigating factors. Yet, the court announced its consideration of the principles and factors contained in sentencing statutes such as R.C. 2929.11 and R.C. 2929.12. The court also noted its consideration of all the evidence from trial, the testimony of Appellant's family from the bond hearing (which defense counsel asked him to consider for sentencing), and psychological reports that were not introduced at trial

(which defense counsel also submitted at sentencing). (Sent.Tr. 14). The court also considered the pre-sentence investigation previously ordered. Thus, contrary to Appellant's contention, the court did consider mitigating evidence.

**{¶146}** In arguing bias, Appellant also points to the detective's words during the interview concerning a "cold calculated assassin." In discussing the need to protect the public, the court observed that if Appellant could do this "to someone he loved and his best friend, what could he do to his enemy or someone who opposed him?" (Sent.Tr. 15). Contrary to Appellant's contention, this was not an indication of bias but a way of addressing the likelihood of recidivism and the concerns for public safety. As to these statements, Appellant also complains the court adopted the state's "speculative" theory. However, it was the jury who adopted the prior calculation and design theory; the court could then proceed to sentence on the offense for which the jury rendered a verdict by using the facts which supported that offense.

**{¶147}** Opinions formed by the judge on the basis of facts in the record do not constitute a basis for a bias or partiality motion unless they display a deep-seated antagonism that would make fair judgment impossible, and it is not reversible error for a sentencing judge, in explaining his sentence, to make critical statements about a defendant's conduct based upon the facts of the case presented to the court. *State v. Power*, 7th Dist. Columbiana No. 12 CO 14, 2013-Ohio-4254, ¶ 26-28 ("a judge is encouraged to place a rationale for a sentence on the record, and we cannot reverse every time a judge happens to label the behavior at issue with an adjective that offends" the convicted defendant), citing *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 49 (critical, disapproving, or even hostile statements ordinarily do not support a bias challenge). As there is no indication of bias or a "freakish" failure to consider mitigating evidence (as alleged by Appellant), the as-applied Eighth Amendment argument presented by Appellant fails.

**{¶148}** Furthermore, legislative enactments are strongly presumed to be constitutional, and a statute will not be struck down unless the challenger establishes it is unconstitutional beyond a reasonable doubt. *State v. Weitbrecht*, 86 Ohio St.3d 368, 370, 715 N.E.2d 167 (1999) (determining the sentencing statute for involuntary manslaughter did not violate the cruel and unusual clause of the federal or state constitutions when the

underlying offense was a minor misdemeanor, traffic offense). We note there is no argument here that the statutory sentence is grossly disproportionate to the offense. In addition, this court recently rejected an argument that this same statutory provision violated the Eighth Amendment. *See State v. Austin*, 7th Dist. Mahoning No. 16 MA 68, 2019-Ohio-1185, ¶ 76, 84.

**{¶149}** As therein mentioned, a plurality of the United States Supreme Court found a sentence to life with no possibility of parole is not comparable to a death sentence and is not that different from a sentence to life with a possibility of parole (especially for an older defendant). *Harmelin v. Michigan*, 501 U.S. 957, 996, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (refusing to extend the doctrine of proportionality or individualized capital sentencing to life without parole). This court found "the reasoning of the plurality in *Harmelin* is directly at odds with Justice Sotomayor's observation that life-without-parole sentences, because of their likeness to death sentences, must be afforded meaningful appellate review." *Austin*, 7th Dist. Mahoning No. 16 MA 68 at ¶ 75. Likewise, we do not find Appellant established beyond a reasonable doubt that R.C. 2953.08(D)(3) is unconstitutional under the Eighth Amendment and the Ohio Constitution, Article I, Section 9.

**{¶150}** Lastly, we note that in addition to citing Article I, Section 9 (the counterpart to the Eighth Amendment), the text of the assignment of error also lists Sections 1, 2, 16, and 19 of Article I of the Ohio Constitution. Section 1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Section 2 contains Ohio's equal protection clause. Section 16 provides in part: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay * * *." Section 19 deals with eminent domain.

**{¶151}** It cannot be fathomed how Section 19 applies. As to Section 16 (due process), we note "there is no constitutional right to an appellate review of a criminal sentence." *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668 (1997), citing *Estelle v. Dorrough*, 420 U.S. 534, 536, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1970) ("the

right of appeal is not essential to due process, provided that due process has already been accorded in the tribunal of first instance"). And, we discussed bias above. As to Section 2 (equal protection), courts including this one have found aggravated murder is unique and there is a rational basis for treating it different than other felonies in the realm of sentencing. *See Austin*, 7th Dist. Mahoning No. 16 MA 68 at ¶ 68 (citing cases from various districts).

**{¶152}** Regardless, Appellant does not discuss the concepts within any section of the Ohio Constitution except Section 9 of Article I (the counterpart to the Eighth Amendment). He merely mentions in a footnote to his brief that Justice Sotomayor said in a footnote that the *Campbell* defendant framed his arguments under the due process and equal protection clauses, rather than under the Eighth Amendment (which her statement revolved around). Appellant's argument and summary focus on only the Eighth Amendment. Due to the failure of briefing on the listed but not argued sections of the Ohio Constitution, the brief is insufficient to raise arguments under those sections, and the Eighth Amendment was addressed above. This assignment of error is overruled.

**{¶153}** For all of the foregoing reasons, the trial court's judgment is affirmed.

Donofrio, J., concurs.

D'Apolito, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**